IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ELI WAYNE FREELAND,

          Plaintiff,

v.                                                CIVIL ACTION NO.   2:12-cv-08712

JEFF HILEWITZ, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

      Pending before the Court is Defendants' Motion for Summary Judgment (the "Motion"). (ECF No. 115.) By Standing Order entered on September 2, 2010 and filed in this case on December 10, 2012, this action was referred to Magistrate Judge Mary E. Stanley for submission of proposed findings of fact and recommendations for disposition. (ECF No. 5.) On April 9, 2013, the Clerk transferred the referral of this matter to Magistrate Judge Dwane L. Tinsley. (ECF No. 18.) On July 27, 2015, Magistrate Judge Tinsley filed proposed findings of fact and recommendations for disposition (the "PF&R"), in which he recommends that the Court grant the Motion and dismiss this action. (ECF No. 146.) Plaintiff filed timely objections to the PF&R (the "Objections") on August 13, 2015. (ECF No. 149.)

      For the reasons discussed herein, the Court **SUSTAINS** the Objections, (*id.*), **DECLINES TO ADOPT** the PF&R, (ECF No. 146), and **DENIES** the Motion, (ECF No. 115).

## I. Background

This is a civil rights action pursuant to 42 U.S.C. § 1983 brought by an inmate at the Mount Olive Correctional Complex ("Mount Olive"). Plaintiff is an inmate "in the custody of the [West Virginia] Division of Corrections" ("DOC") and "has been housed in the Quilliams Segregation Unit" at Mount Olive. (ECF No. 1 at 8.) Defendants are current and former correctional officers at Mount Olive. (*See id.* at 9.)

On September 27, 2012, Plaintiff "was housed in Quilliams II, Pod 5, one of two segregation units" at Mount Olive. (ECF No. 17 at 2.) On that date, Defendants were working as correctional officers in this segregation unit. (*See, e.g.*, ECF No. 116 at 1–3.) At approximately 3:15 p.m., one or more Defendants took "Plaintiff . . . to a phone located in the dayroom of Pod 5 to make a telephone call," and "handcuffed one of . . . Plaintiff's arms to a fixed bar next to the phone." (*Id.* at 1; *cf.* ECF No. 125 at 7–8 ("Plaintiff . . . was tethered to the wall in handcuffs and leg irons . . . .").) "The officers left the pod while . . . Plaintiff was shackled to the wall and using the phone." (ECF No. 116 at 2; *see also id.* (providing Defendants' assertion that "Plaintiff was chained to the wall because it is DOC policy that all inmates must be stripped searched [sic], handcuffed and shackled prior to leaving their cell for any reason when officers are in the pod").)

While Plaintiff was using the telephone to speak with his mother, (*see, e.g.*, ECF No. 125, Ex. 17 (providing the declaration of Michelle L. Dorsey—Plaintiff's mother)), another inmate housed in Pod 5—Joseph Howard—"bang[ed] on his cell door" until it opened, (*e.g.*, ECF No. 116 at 2). Howard then exited his cell carrying a metal rod, (*see, e.g.*, *id.* at 2; *cf.* ECF No. 1 at 10 (providing Plaintiff's allegation that "Howard exited his cell carrying the iron post of his cell stool which he apparently had somehow unbolted from his floor")), proceeded to where Plaintiff was

2

speaking on the phone, and repeatedly hit Plaintiff with the metal rod (the "Assault"), (*see, e.g.*, ECF No. 1 at 10; *see also id.* (providing Plaintiff's allegation that Howard hit Plaintiff "several times" with the metal rod)). Plaintiff alleges that, as a result of the Assault, he "received injuries on [his] head resulting of [sic] loss of hearing in [his] left ear, injuries on [his] left shoulder resulting in a crack or separation, injuries on [his] right arm and on both hands." (*Id.*)

Defendants were not in Pod 5 at the time Howard exited his cell and attacked Plaintiff. (*See, e.g.*, *id.*; ECF No. 116 at 2–3.) Instead, Defendant Bunch was in a nearby control tower, (*see, e.g.*, ECF No. 1 at 10; ECF No. 116 at 2–3), where he remained during the Assault, (*see, e.g.*, ECF No. 1 at 10). Defendant Hahn testified that he was in the restroom, but "went to the pod door" when Defendant "Bunch warn[ed] the officers that there was a problem in one of the pods." (ECF No. 116 at 3; *cf.* ECF No. 115, Ex. 1 at 8:2–4 (providing Defendant Hahn's deposition testimony that he "didn't actually witness" Howard strike Plaintiff).) The record is not clear as to whether Defendant Hilewitz was at the pod door for part of the Assault. (*Compare* ECF No. 115, Ex. 1 at 7:13–16 (providing Defendant's Hahn's deposition testimony that he "passed [Defendant] Hilewitz" when he left the restroom and moved to the pod door), *with* ECF No. 125, Ex. 6 (providing the affidavit of inmate Miguel Delgado, in which he states that he "witnessed Sgt. Hilewitz, Cpl. Fernandez, c/o Elliot, and c/o Bunch just stand there and watch as Howard continued to swing the iron post and hit [Plaintiff]").) However, it is uncontested that—at some point during or after the Assault—Defendant Hilewitz left the pod door "to retrieve a gas gun." (ECF No. 116 at 3; *see also* ECF No. 135, Ex. A at 9–10 (providing the interrogatory response of Defendant Fernandez, in which he asserts that Defendant Hilewitz "retrieved the 37mm from the Tower").) Defendant Fernandez and another non-defendant correctional officer were also at the pod door

during at least part of the Assault. (*See, e.g.*, ECF No. 1 at 10; ECF No. 115, Ex. 1 at 10:4–7 (providing Defendant Hahn's deposition testimony in which he states that two officers were at the pod door when he arrived at the door).) Before and during the Assault, Defendants each carried pepper spray. (*See, e.g.*, ECF No. 116 at 6; *see also* ECF No. 135, Ex. A at 5 (constituting the interrogatory response of Defendant Fernandez, in which he states that "MK-IV oleoresin capsicum were carried on person").)

Defendants assert that they gave verbal commands to Howard to stop during the Assault, (*see, e.g.*, ECF No. 135, Ex. A at 9–10 (providing the interrogatory response of Defendant Fernandez, in which he states that "[v]erbal commands were given for Inmate Howard to stop")), but the record is similarly unclear on this point, (*see, e.g.*, ECF No. 125, Ex. 6 at 2 (constituting the affidavit of inmate Miguel Delgado, in which he states that Defendants were "spectators" during the Assault and neither said nor did anything)). The pod door had "a bean hole," but Defendants did not discharge pepper spray through this space—which they assert was because "the telephone area where . . . Plaintiff was attacked is out of range for the MK-9/pepper spray." (ECF No. 116 at 6.) Ultimately, it is uncontested that Defendants did not enter Pod 5 until after Howard voluntary ceased hitting Plaintiff with the metal rod and Hilewitz returned with the gas gun. (*See, e.g.*, ECF No. 135, Ex. A at 5 (providing the interrogatory response of Defendant Hilewitz, in which he states that "[w]hen [he] arrived with the gas gun there was no reason to discharge the same as Inmate Howard had retreated to the top tier and was returning to his cell"); ECF No. 116 at 3 (constituting Defendants' statement that they "waited until [Defendant] Hilewitz returned with the gas gun before entering the pod").)

On December 10, 2012, Plaintiff filed the Complaint in this Court. (ECF No. 1; *see also* ECF No. 22 (constituting Plaintiff's Motion to Supplement/Amend § 1983 Complaint). *See generally* ECF No. 36 at 3 (providing Magistrate Judge Tinsley's July 24, 2013 order, in which he orders that "[t]he court will, from this point forward, collectively refer to document numbers 1 and 22 as 'the plaintiff's Amended Complaint'").) The Complaint includes claims against Defendants, as well as David Ballard (the warden of Mount Olive) and Russell Matheney (the Segregation Commander at Mount Olive). (ECF No. 1 at 8–9.) The Complaint asserts Section 1983 claims, which allege that Defendants exhibited "deliberate indifference to [P]laintiff's safety and deliberate indifference toward serious security breaches which did cause [P]laintiff to be violently assaulted by another prisoner, in violation of the Eighth Amendment to the United States Constitution." (*Id.* at 8.)

On April 9, 2013, the defendants named in the Complaint filed a motion to dismiss. (ECF No. 16.) On March 13, 2014, this Court entered an opinion granting in part and denying in part this motion to dismiss. (ECF No. 57.) In particular, the Court granted the motion to dismiss "to the extent that Defendants have been sued for monetary damages in their official capacities and concerning Plaintiff's supervisory liability claims against Defendants Matheny and Ballard." (*Id.* at 17.) The Court also found that the allegations in the Complaint "do not give rise to a facially plausible claim that Defendants had actual knowledge of a substantial risk of harm to Plaintiff and disregarded that risk." (*Id.* at 13.) However, the Court did find that one of Plaintiff's claims survived the motion to dismiss—the claim "concerning the failure of [Defendants] to intervene in the attack of Plaintiff by inmate Howard on September 27, 2012." (*Id.* at 14.) As such, Plaintiff's

failure-to-intervene claim is Plaintiff's final remaining claim at the present summary judgment stage.[1] (*See id.*)

On October 10, 2014, Defendants filed the Motion. (ECF No. 116.) Plaintiff filed his opposition to the Motion on November 18, 2014, (ECF No. 125), Defendants filed their reply in support of the Motion on January 12, 2015, (ECF No. 135), and Plaintiff filed an unauthorized "Supplemental Response" in opposition to the Motion on February 6, 2015, (ECF No. 136). Subsequently, on July 27, 2015, Magistrate Judge Tinsley filed his PF&R, in which he recommends that the Court grant the Motion and dismiss this matter. (ECF No. 146.) Plaintiff timely filed the Objections on August 13, 2015. (ECF No. 149.) As such, both the PF&R and the Motion are fully briefed and ready for disposition.

## II. Legal Standard

**A.     Review of the PF&R**

The Court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge "when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In addition, the Court need not conduct a de novo review when a petitioner "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Id.* In

---

[1] The Court notes that Plaintiff allocated a large portion of his briefing regarding the Motion and PF&R discussing whether Defendants had prior knowledge that the doors in Pod 5—including the door to Howard's cell—could open as the result of repeated pressure from kicking or other similar force. (*See, e.g.*, ECF No. 125.) However, the Court previously dismissed Plaintiff's claims regarding Defendants' knowledge of a potential risk to Plaintiff's health prior to the Assault. (ECF No. 57 at 13.) As such, the issue of whether Defendants heard Howard beating on his door prior to the Assault is immaterial for the present analysis. Rather, Plaintiff's only remaining claim is whether Defendants violated his constitutional rights in their response to the Assault. (*See id.* at 14.)

reviewing those portions of the PF&R to which Plaintiff objected, the Court will consider the fact that Plaintiff is acting pro se and his pleadings will be accorded liberal construction. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978).

**B.     Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides that a court should grant summary judgment if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When construing such factual issues, the Court must view the evidence "in the light most favorable to" the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Liberty Lobby*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477

7

U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### *III. Discussion*

In the Objections, Plaintiff contests Magistrate Judge Tinsley's recommendation that Defendants are entitled to summary judgment as to the sole remaining claim in the Complaint, which alleges that Defendants violated Plaintiff's rights under the Eighth and Fourteenth Amendments by failing to intervene in the Assault. (*See* ECF No. 149. *See generally* ECF No. 1 at 8 (providing Plaintiff's allegation that Defendants were "deliberate[ly] indifferen[t] to [P]laintiff's safety . . . in violation of the Eighth Amendment to the United States Constitution").) For the reasons that follow, the Court **SUSTAINS** the Objections, **DECLINES TO ADOPT** the PF&R, and **DENIES** the Motion.

Plaintiff brings his claim pursuant to 42 U.S.C. § 1983. (ECF No. 1 at 8.) "Section 1983 is a codification of § 1 of the Civil Rights Act of 1871," *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997), and provides the following, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "The text of [Section 1983] purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina*, 522 U.S. at 123. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To maintain a § 1983 action, [a plaintiff] must show that: (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) that the defendants deprived him of this right while acting under 'color of any [law].'" *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (second alteration in original) (citation omitted); *see also Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997) ("Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law.").

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement . . . ." *Id.* "Prisons house 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct[,]' and at the same time 'strip[s]' inmates 'of virtually every means of self-protection.'" *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) (alterations in original) (quoting *Farmer*, 511 U.S. at 833). "[T]he government and its officials are not free to let the state of nature take its course[, and] gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective." *Id.* (alterations in original) (quoting *Farmer*, 511 U.S.

9

at 833).

"Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety." *Id.* In particular, prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988)); *see also Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997) ("[A]s a component of their duty to provide inmates with humane conditions of confinement, prison officials [are] required to 'take reasonable measures to guarantee the safety of the inmates.'" (quoting *Farmer*, 511 U.S. at 831)). *See generally Solesbee v. Witkowski*, 56 F.3d 62, at *4 (4th Cir. 1995) (noting that "[t]he general duty of prison officials to protect inmates committed to their care [is] clearly established"). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.

A prisoner must establish two elements to sustain a failure-to-protect claim under the Eighth Amendment: (1) "the deprivation alleged must be, objectively, sufficiently serious," that is "the denial of the minimal civilized measure of life's necessities;" and (2) the prison official had a "sufficiently culpable state of mind," which is "one of deliberate indifference to inmate health or safety." *Id.* (citations omitted). Under the first prong―*i.e.*, the objective inquiry, "a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)), "or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions," *id.* (citing *Helling v.*

10

*McKinney*, 509 U.S. 25, 33–35 (1993)). In this case, it is uncontested that Plaintiff suffered significant physical injuries as a result of the Assault. (*See* ECF No. 1 at 10 (providing Plaintiff's allegations regarding his injuries).) The Court therefore finds that Plaintiff's injuries satisfy the first prong of a failure-to-protect claim.

The focus of the disagreement between the parties relates to the second prong of this analysis—*i.e.*, the subjective inquiry. (*See, e.g.*, ECF Nos. 116 & 149.) To satisfy the second element of a failure-to-protect claim, the prisoner must show that "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "In other words, 'the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

"Deliberate indifference is a very high standard . . . ." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). It "entails 'more than ordinary lack of due care for the prisoner's interests or safety,' and 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 835); *see, e.g.*, *Freeland v. Ballard*, 6 F. Supp. 3d 683, 689–90 (S.D. W. Va. 2014) ("The negligent failure to protect inmates from violence will not suffice." (citing *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987))). "[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Brice v.*

*Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted).

Defendants argue that their actions during the Assault did not constitute deliberate indifference because they followed protocol and waited to intervene until Defendant Hilewitz returned to the scene of the Assault with a gas gun. (*See, e.g.*, ECF No. 116 at 6–7.) Plaintiff responds that Defendants' response to the Assault was unreasonable and creates genuine issues of material fact on this issue. (*See, e.g.*, ECF No. 125 at 6–8; ECF No. 136 at 2–3.)

The Court finds that Defendants are not entitled to summary judgment on Plaintiff's remaining claim for two reasons. First, there are genuine issues of material fact as to whether Defendants idly watched the Assault without taking any action. The Fourth Circuit―like other courts throughout the country―has found that a correctional officer acts in a deliberately indifferent manner if they "stand[] by as a passive observer and *take[] no action whatsoever* to intervene during an assault." *Odom v. S.C. Dep't of Corrs.*, 349 F.3d 765, 773 (4th Cir. 2003) (citing *Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir. 1978)); *see, e.g.*, *Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir. 1994) ("A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault." (citations omitted)).

Plaintiff provided the affidavits of numerous inmates who were in the same pod at the time of the Assault. (*See, e.g.*, ECF No. 125, Exs. 6–14; *see also id.*, Ex. 17 (constituting the affidavit of Plaintiff's mother, who was speaking to Plaintiff by telephone at the time of the Assault).) These affidavits indicate that Defendants witnessed the Assault, but took no action. (*See id.*, Ex. 6 at 2 (providing the affidavit of inmate Miguel Delgado, in which he states the following, in relevant part: "I witnessed Sgt. Hilewitz, Cpl. Fernandez, c/o Elliot, and c/o Bunch just stand there and

12

watch as Howard continued to swing the iron post and hit [Plaintiff]. . . . I then saw Cpl. Hahn approach and join the spectators, Hilewitz, Fernandez, Elliot, and Bunch, who was in the Tower. They said nothing. They did nothing. They did not yell "STOP!", nothing, but just stand there and watch [Plaintiff] as he was being assaulted." (emphasis in original)); *id.*, Ex. 8 at 2 (constituting the declaration of inmate Travis Kline, in which he states that the "C.O.s were standing directly outside watching [the Assault] happen and did absolutely nothing to stop it until the guy holding the stool decided he was finished and walked away on his own accord"); *id.*, Ex. 9 at 1 (providing the declaration of inmate Ryan Tilley, in which he describes the Assault and states that "[t]he officers was [sic] standing out around the pod door and didn't come in to help [Plaintiff]"); *id.*, Ex. 10 at 1 (constituting the declaration of inmate James D. Hall, Jr., in which he notes that he "watched the C.O.s watching the [Assault] take place, from the Control Tower and the pod entrance"); *id.*, Ex. 11 at 1 (providing the declaration of inmate Cody Fetty, in which he says the following, in pertinent part: "I see this guy with a steel stool standing in front of [Plaintiff]. He then hit [Plaintiff] with the stool 3 or 4 times. . . . All the while the correctional officers were standing at the pod door letting all this transpire as [Plaintiff] was chained to the wall."); *id.*, Ex. 12 at 1 (constituting the declaration of inmate William Macri, in which he states that "[w]hile [the Assault] was taking place the C.O.s did nothing to try to stop what was taking place"); *id.*, Ex. 13 at 1 (providing the declaration of inmate Jason L. Wade, in which he notes that "[t]he inmate . . . repeatedly hit [Plaintiff] with a metal stool, while the C.O.s watched at the pod door doing nothing at all to help [Plaintiff]"); *see also id.*, Ex. 14 at 2 (constituting the second declaration of inmate Cody Fetty, in which he notes the following, in pertinent part: "I witnessed Joe violently attack [Plaintiff] while [Plaintiff] was helpless chained to the wall in the pod. While the c/o did nothing to help.").)

13

These numerous affidavits create genuine issues of material fact as to whether Defendants idly watched the Assault and took no action at all to intervene. *Cf. Gordon*, 574 F.2d at 1152 (reversing the district court's grant of summary judgment to the defendant correctional officers where, "[f]rom the additional pleadings, affidavits and exhibits, it appear[ed] that [the plaintiff asserted] that he was brutalized . . . by fellow inmates, that the correctional officers . . . were present and saw what was transpiring, but, nevertheless, that [the correctional officers] declined to intervene and permitted the assault to continue"); *Carter v. Johnson*, Civil Action No. 7:10–cv–00342, 2013 WL 953998, at *9 (W.D. Va. Mar. 12, 2013) (denying summary judgment to the defendant correctional officer where there were questions of fact as to whether the officer "stood idly by while [an inmate] pummeled [the plaintiff] unconscious"). *See generally Mann v. Failey*, 578 F. App'x 267, 272 n.2 (4th Cir. 2014) ("It is well settled that [courts] may not, at summary judgment, discount viable, material evidence on the ground that it was offered by a plaintiff with a troubled past. . . . [T]his rule is acutely necessary in cases with pro se prisoner plaintiffs, where events take place with only prison guards present, and an inmate has little control of his situation and movement, and few means of establishing facts . . . ."). The Court therefore finds that Defendants are not entitled to summary judgment as to the issue of whether Defendants were deliberately indifferent to Plaintiff's health and safety by idly watching the Assault. *See, e.g.*, *Odom*, 349 F.3d at 773 (stating that a correctional officer acts in a deliberately indifferent manner if they "stand[] by as a passive observer and *take[] no action whatsoever* to intervene during an assault" (citing *Gordon*, 574 F.2d at 1152)). This issue is properly left to the trier of fact.

Second, even if Defendants' accounts of their actions are accurate, there are genuine issues of material fact as to whether their response to the Assault was reasonable. Of course, it is well-

14

established that "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (citation omitted); *see, e.g.*, *Winfield v. Bass*, 106 F.3d 525, 533 (4th Cir. 1997) (finding that the defendant "correctional officers violated no clearly established right of [the plaintiff's] because they were not required to risk serious bodily harm by entering, unarmed, into a fray with an armed and violent assailant during the short period before assistance arrived"); *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007) ("A prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy." (citation omitted)); *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) ("[N]o rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence."); *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995) (finding that prison staff does not evince deliberate indifference if the prisoners are evenly matched, the defendants call for additional assistance, and "were preparing to intervene when sufficient staff was available in accordance with prison policy"). However, the test for deliberate indifference in this context remains "whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). "A reasonable response to a known risk is sufficient to escape liability even if the harm is not averted." *Solesbee v. Witkowski*, 56 F.3d 62, at *3 (4th Cir. 1995) (citation omitted). However, "if there is some substantial evidence that the responses were not reasonable, the argument fails." *Id.*

Defendants argue that they reasonably responded to the Assault by waiting to enter the room where the Assault occurred until Defendant Hilewitz retrieved a gas gun. (*See, e.g.*, ECF 116 at 6–7.) The Court finds that the reasonableness of Defendants' purported response to the Assault is far from clear. Plaintiff was restrained and, as such, was not in a position to flee or protect himself from Howard's blows with the metal rod. (*See, e.g.*, *id.* at 5 ("The correctional officers secured [Plaintiff] to the wall so that he could use the phone."); ECF No. 125 at 7–8 ("Plaintiff . . . was tethered to the wall in handcuffs and leg irons . . . .").) Indeed, some of Defendants caused the restraint by shackling Plaintiff to a wall prior to his telephone conversation with his mother. (*See, e.g.*, ECF 116 at 5.) Further, there was only one assailant with a metal rod, whereas multiple correctional officers—one to three Defendants, depending on the accuracy of the facts, and a non-defendant correctional officer—were immediately outside of the pod and the fourth Defendant (Bunch) was nearby in a tower. (*See, e.g.*, ECF No. 115, Ex. 1 at 10:4–7 (providing Defendant Hahn's deposition testimony, in which he states that "there were two officers that were yelling instructions to Mr. Howard" when he arrived at the pod door); ECF No. 125, Ex. 6 at 2 (providing the affidavit of inmate Miguel Delgado, in which he states the following, in part: "I witnessed Sgt. Hilewitz, Cpl. Fernandez, c/o Elliot, and c/o Bunch just stand there and watch as Howard continued to swing the iron post and hit [Plainitff]. . . . I then saw Cpl. Hahn approach and join the spectators, Hilewitz, Fernandez, Elliot, and Bunch, who was in the Tower.").) There was also no risk of additional potential assailants creating a danger to Defendants' safety if they intervened, as "all prisoners in Pod 5 . . . were secured." (ECF No. 116 at 5 ("At the time of the incident, all prisoners in Pod 5 . . . were secured. The correctional officers secured [Plaintiff] to the wall so that he could use the phone. All other inmates were secured inside their cells.").) Finally, Defendants were

armed with an agent capable of at least partially incapacitating the assailant and halting the Assault—pepper spray. (*See, e.g.*, *id.* at 6.) These facts are a far cry from the situations where courts previously found that waiting for additional assistance was a reasonable response to an inmate-on-inmate attack. *See, e.g.*, *Winfield,* 106 F.3d at 532–33 (finding that "the two unarmed correctional officers who were present when the attack began" did not violate the plaintiff's constitutional rights by not immediately intervening when the plaintiff was attacked by another inmate with "a shank"); *Prosser*, 70 F.3d at 1008 (finding that a correctional officer had no constitutional duty to intervene in an inmate-on-inmate attack where the officer "was alone . . . with at least a dozen inmates standing between him and the other guards" and the attacker "was armed" with a "weapon . . . formidable enough to inflict permanent injuries"); *Morris v. Ward*, No. 4:06-CV-13, 2007 WL 951433, at *1 (W.D. Mich. Mar. 27, 2007) (finding that a correctional officer did not violate the plaintiff's clearly established constitutional rights "by not immediately interposing himself between" the plaintiff and another inmate, who was armed with "a squeegee"). *See generally Odom v. S.C. Dep't of Corrs.*, 349 F.3d 765, 773 (4th Cir. 2003) ("[C]orrectional officers who are present when a violent altercation involving an armed inmate erupts and fail to intervene immediately do not violate the Eighth Amendment if the officers are unarmed, unaware of a risk of harm prior to the altercation, and take reasonable steps to intervene safely." (citation omitted)); *Prosser*, 70 F.3d at 1008 ("[P]rison guards are not constitutionally required to intervene in violent fights between inmates when the inmates outnumber guards." (citation omitted)). As such, even if Defendants' accounts of their response to the Assault are accurate, there are genuine issues of material fact as to whether their response was unreasonable to the point of deliberate indifference.

Defendants nonetheless contend that they followed DOC policy by declining to immediately intervene in the Assault. (ECF No. 116 at 6 ("By DOC policy, the correctional officers are not allowed to enter the pod without cover while there is an unrestrained inmate in the pod."); *id.* ("[Defendants] entered the pod as quickly as possible, while complying with policy and obtaining a weapon sufficient to deter additional attacks by Inmate Howard, when they realized there was imminent danger to [Plaintiff].").) As the Supreme Court noted, "the problems that arise in the day-to-day operations of a corrections facility are not susceptible of easy solutions." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citations omitted). However, this deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

In this case, Defendants claim that they followed DOC policies by not immediately intervening in the Assault. (*See, e.g.*, ECF No. 116 at 6–7.) However, Defendants failed to supplement the record with these written policies. The Court therefore cannot determine whether Defendants' actions―or inaction―were in accordance with those policies. Absent this evidence, the Court declines to presume that Defendants' conduct was in accordance with established DOC policies and procedures. *Cf. Whitley*, 475 U.S. at 322 (stating that a court's deference to a correctional institution's policies "does not insulate from review actions taken in bad faith and for no legitimate purpose").

In summary, the Court finds that there are genuine issues of material fact as to whether: (1) Defendants idly watched the Assault without taking any steps to intervene; and (2) Defendants' purported response to the Assault was unreasonable to the point of deliberate indifference. As such, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's remaining claim and the Magistrate Judge erred by finding otherwise.

### IV. Conclusion

For the reasons discussed above, the Court **SUSTAINS** the Objections, (ECF No. 149), **DECLINES TO ADOPT** the PF&R, (ECF No. 146), and **DENIES** the Motion, (ECF No. 115).[2]

This case is now ready to move toward a trial. However, the Court observes that it would be beneficial in a number of ways for Plaintiff to obtain counsel to assist him going forward. Given the fee-shifting scheme available in § 1983 litigation and the current posture of the case, it is possible that Plaintiff will now be able to retain counsel.

Accordingly, the Court **ORDERS** that Plaintiff retain counsel, if he is going to do so, within **30 days** of the date of this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

---

[2] On August 10, 2015, Plaintiff filed a motion entitled "Request for More Time to File 'Objections' in Regards to Magistrate Judge Dwane Tinsley's Proposed Findings and Recommendations in the Above Stated Action" (the "Motion for Extension"). (ECF No. 148.) Plaintiff filed the Objections in a timely fashion prior to the Court ruling on the Motion for Extension. (*See* ECF No. 149.) As such, the Court **DENIES AS MOOT** the Motion for Extension. (ECF No. 148.)

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

       ENTER:  September 28, 2015

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE